**COLUMBIA GAS TRANSMISSION CORPORATION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**United Gas Pipe Line Company, Intervenor.**

**No. 83–2193.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 1, 1984.

Decided Dec. 14, 1984.

Petition for Review of an Order of the Federal Energy Regulatory Commission.

Stephen J. Small, Charleston, W. Va., with whom Amos W. Perrine and Giles D.H. Snyder, Charleston, W. Va., were on the brief, for petitioner.

John H. Conway, Atty., F.E.R.C., Washington, D.C., with whom Jerome M. Feit, Sol., and Joshua Z. Rokach, Atty., F.E.R.C., Washington, D.C., were on the brief, for respondent.

Irving Jacob Golub, Houston, Tex., with whom Phillip D. Endom, Houston, Tex., was on the brief, for intervenor, United Gas Pipe Line Co.

Before GINSBURG and STARR, Circuit Judges, and JACKSON,* District Judge.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This case raises questions with respect to the authority of the Federal Energy Regulatory Commission (Commission) to fashion remedies in the setting of "paybacks" of natural gas by one interstate pipeline to another.

## I

The history of this case is complex and detailed, going back to 1958 when United Gas Pipe Line Company (United), the intervenor in this proceeding, contracted with two producers-marketers, namely Humble Oil & Refining Company (now Exxon Corporation) and the Cullen family, to purchase natural gas in the Garden City, Louisiana Field. The background is amply set forth in this court's opinion at an earlier stage of these proceedings, *Columbia Gas Transmission Corp. v. FPC*, 530 F.2d 1056, 1058–59 (D.C.Cir.1976), and will therefore not be described in detail here. Suffice it to say that a dispute arose between United and Columbia Gas Transmission Corporation (Columbia), another interstate natural gas pipeline company subject to the Commission's jurisdiction and the petitioner in this proceeding, over the right to certain gas produced by three gas companies in the Garden City Field.[1] Columbia's position was that the volumes of gas proposed to be sold to United by the three companies should be included in United's contractually specified maximum volume limitation (120,000 Mcf) as set forth in the original 1958 contract, as amended in 1963.

To break their standoff, Columbia and United arrived at an interim agreement which permitted Columbia, to the exclusion of United, to receive all the disputed volumes of gas. Columbia agreed, however, to take the gas subject to a "payback" requirement, namely that it would supply United with equivalent volumes of gas if Columbia were subsequently found not to have been entitled to it in the first instance. The Commission[2] approved this arrangement in a letter order granting a temporary certificate authorizing the sales, but explic-

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The three gas companies were Texas Gas Exploration Corporation, Gulf Oil Corporation, and Southern Natural Gas Company. The gas production of those companies from the Garden City Field had previously been marketed by the Cullen family and the Cullen family's successor. In 1971, after Cullen's successor ceased marketing the gas attributable to the interests of those producers, the three companies thereafter executed contracts to sell their gas to United and at this time, two companies sought Commission approval. It was at that juncture that Columbia intervened, advancing the position described in the text that follows.

2. This was, of course, the Federal Power Commission, the predecessor to the Federal Energy Regulatory Commission.

itly conditioned the arrangement in language that is important to the resolution of the case as it reaches us:

> (5) In the event the controversy [sic] [between United and Columbia] is ultimately resolved in favor of United, Columbia Gas Transmission Corporation shall deliver, or cause to be delivered, to United a volume of gas equal to the total volume of gas purchased by [Columbia] from [the seller] produced from the Garden City Field ... during the interim period. Such pay back shall be on a ratable basis determined by the total volume of deliveries divided by the number of days during the interim period or upon such other terms as are mutually agreeable to United and Columbia or as the Commission may determine....
>
> (6) The issuance of this temporary authorization is without prejudice to the rights and interests of any of the parties in any Commission proceedings or any other legal proceeding in a court of competent jurisdiction involving the rights of United and Columbia to purchase gas produced from the Garden City Field.

Record (R.) at 1392–93, Appendix (App.) at 45–46. Critically, the Commission's letter order certificating the sale did not establish the *price* of payback gas, if the payback obligation were to mature.

The Commission eventually determined, pursuant to a request by United for a declaratory order interpreting its contractual rights, that United, and not Columbia, was entitled to the gas under the contract: "There is no contractual basis for deducting from United's entitlement under [the 1958 contract between United and Humble-Cullen] the volumes of gas that the appli-

cant companies [Texas, Gulf, and Southern] now seek to furnish directly to United ...." *Texas Gas Exploration Corp.*, 52 F.P.C. 940, 950, *reh'g denied*, 52 F.P.C. 1807 (1974), *aff'd sub nom. Columbia Gas Transmission Corp. v. FPC*, 530 F.2d 1056 (D.C.Cir.1976). This court affirmed, stating that "[t]he FPC's interpretation of the contract is in accordance with its literal terms, and is supported by a plausible explanation of the intendment of the parties." 530 F.2d at 1059.

Columbia commenced payback of the gas in 1978. Columbia and United could not, however, agree on the price for the payback gas. The two firms thereupon returned to the Commission, seeking yet another declaratory order. In this phase of the proceedings, Columbia asserted that it should receive the weighted average cost of the gas supplied to United during the payback period.[3] By virtue of the dramatic increase in the price of natural gas between the time Columbia originally took the gas and the time Columbia "paid back" the gas, Columbia's cost for the payback gas had risen substantially above the cost for the gas it had received earlier. United, in contrast, claimed that the appropriate price would be the price United itself would have paid in the earlier years had the gas been delivered as contemplated before Columbia's intervention.[4]

The Commission staff recommended to the Commission, in Solomonic fashion, that the parties split the difference. R. 51. Both parties objected to this solution. R. 58–59 (Columbia's opposition); R. 66–68 (United's opposition). With the stage thus set, the Commission eventually handed down its ruling, finding in favor of United.[5]

---

3. Columbia initially stated this position in the Joint Petition of United Gas Pipe Line Company and Columbia Gas Transmission Corporation for a Declaratory Order Determining the Price of Gas Under a Payback Arrangement Pursuant to Federal Power Commission Order (hereinafter referred to as the Joint Petition) R. 1, App. 1. At the time of the initial petition, payback was underway. Columbia stated "its average cost of all Louisiana gas (onshore and offshore) was 85.19¢ per Mcf in the month of August, 1977. This figure will no doubt tend to increase

during the four-year payback period." Joint Petition at 5, R. 5, App. 5. Columbia represents that the final volume-weighted average price for the payback period is $1.4969 per Mcf. Brief for Petitioner at 4.

4. *See supra* note 1.

5. Our review of the record reveals that this issue was before the Commission for quite some time. The joint petition by United and Columbia was filed on December 14, 1977. The Commission

In its opinion, the Commission began by reciting that the parties had asked for a declaratory opinion on the price that United should pay for natural gas "that Columbia *illegally took* from United and subsequently paid back." R. 93, App. 8 (emphasis added). The Commission stated that it was called upon, in effect, to balance the equities between the parties and concluded that the equities were not even:

> Columbia's contractual right to the disputed volumes of gas was not merely inferior to United's; it was nonexistent. Humble breached its contract with United and sold United's gas to Columbia. By agreeing to the conditions built into the temporary certificates ... Columbia, in essence, stepped into Humble's shoes. Columbia assumed the risk of an adverse ruling on the contract question.

R. 105, App. 20. Referring to its broad discretion to fashion equitable remedies, the Commission expressly considered the following factors: (1) Columbia's customers received the gas at a time of deep curtailment; (2) United and its customers were injured by the reduction of United's gas supply during this period, and (3) United was in no wise accountable for the fact that gas prices had risen dramatically by the time the payback obligation was fulfilled. R. 113–14, App. 28–29. Columbia does not dispute the accuracy of these three points; rather it asserts that other factors, such as the Commission's precedents, should have compelled the Commission to decide differently than it did. The Commission, however, concluded that Co-lumbia would be unjustly enriched if it were allowed to receive more than the original contract price for the payback gas, and therefore ruled in favor of United.[6] R. 114–15, App. 29–30. Following the Commission's denial of rehearing, R. 128, Columbia petitioned this court for review. We affirm the Commission's decision.

## II

On appeal, Columbia argues that the Commission acted irrationally and in violation of its past precedents. Petitioner contends that this court's decision in *Arizona Electric Power Cooperative, Inc. v. FERC*, 631 F.2d 802 (D.C.Cir.1980) (per curiam) [hereinafter cited as *AEPCO*], controls this case and required the Commission to provide for payback at the cost at the time of payback instead of past prices. Otherwise, Columbia contends, United would be able to take today's expensive gas at yesterday's low prices. Petitioner argues further that the temporary certificate issued by the Commission entitled it to the gas, and therefore the Commission improperly concluded that Columbia "illegally took" the gas. In Columbia's view, the temporary certificate overrides any mere contractual obligation and conclusively establishes the legality of the taking. Inasmuch as the taking was lawful, the argument goes, the Commission improperly applied restitutionary analysis in crafting its remedy. Finally, Columbia maintains that the Commission improperly considered evidence of a settlement offer, in violation of the Commission's Rules of Practice and Procedure.

---

noticed the petition on January 10, 1978, but then took no action, prompting United in July 1980, two and a half years later, to file a Motion for Prompt Action. The Commission stirred, issuing an order in August 1980 setting the matter for briefing. Initial Briefs and Reply Briefs were promptly filed, but, following the flurry of briefing in the summer of 1980 nothing, once again, happened. In August 1981, United filed yet another request for prompt action, again bringing the "inordinate delay" to the agency's attention. Letter of I. Jay Golub, September 1, 1981, R. 84. This epistle occasioned only silence, whereupon in mid-September 1982, United and Columbia filed a fourth request to the Commission to decide the matter. The Commission finally issued its decision on July 20, 1983, almost six years after the joint petition had been filed.

6. United and Columbia had agreed that United would pay 26.99 cents per Mcf until the Commission issued its decision. If the Commission decided in favor of Columbia, the parties agreed that United would then pay to Columbia the difference between the higher rate determined by the Commission and the amount paid by United, plus interest. After the Commission's decision, United made refunds to its customers representing the savings between the then-current price of gas and the price paid by United. R. 129.

## A

■ Under settled principles, our standard of review in this case is highly deferential:

[T]he breadth of agency discretion is, if anything, at [its] zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of policies, remedies and sanctions ... in order to arrive at maximum effectuation of Congressional objectives.

*Niagara Mohawk Power Corp. v. FPC,* 379 F.2d 153, 159 (D.C.Cir.1967) (applying Federal Power Act). *See Gulf Oil Corp. v. FPC,* 563 F.2d 588, 606 (3d Cir.1977), *cert. denied,* 434 U.S. 1062 (1978) (applying *Niagara Mohawk* standard to a case arising under the Natural Gas Act). Congress recognized that the Commission, not the courts, was best suited to make such determinations in light of its detailed knowledge of industry conditions:

The difficult problem of balancing competing equities and interests has been given by Congress to the Commission with full knowledge that this judgment requires a great deal of discretion. Accordingly, it is not the role of the courts to second guess the Commission's judgment because we think we could devise a better solution than that which the agency has adopted so long as the agency's determination has a rational basis.

*AEPCO,* 631 F.2d at 809. Therefore, unless its determination lacks a rational basis, the Commission's order must be affirmed.

## B

■ This appears to be the first time the Commission has been called upon to set a price for payback gas where the parties *contractually* created the payback obligation. It has nonetheless been clear for some time that the Commission has broad authority to fashion equitable remedies in a variety of settings. *See, e.g., United Gas Improvement Co. v. Callery Properties, Inc.,* 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965) (approving FPC orders of refunds with interest of amounts collected in excess of just and reasonable rates); *Mesa Petroleum Co. v. FPC,* 441 F.2d 182, 186–87 (5th Cir.1971). Specifically, the Commission's authority to order payback of gas instead of money refunds has been confirmed by this court in *AEPCO* and by the Fifth Circuit in *Cox v. FERC,* 581 F.2d 449 (5th Cir.1978).

The principle fairly drawn from prior cases is that the Commission has broad authority to fashion remedies so as to do equity consistent with the public interest. Obviously, what is appropriate varies according to the circumstances before the Commission. In the instant case, the Commission made its decision with full knowledge and consideration of the cases cited above and the broad equitable principle they represent.

As we have already observed, the Commission considered and relied upon several factors. The Commission discussed the benefits received by the parties as a result of the interim agreement, noting that Columbia "received the gas at a time of deep curtailment," R. 113, App. 28, while United had to try to obtain replacement gas if possible during that difficult period. The Commission observed that Columbia had no contractual right to the gas it received. "Columbia's contractual right to the disputed volumes of gas was not merely inferior to United's; it was nonexistent." R. 105, App. 20. Moreover, the interim agreement did not set a price for the payback gas, so the parties had not decided who would bear the risk of any price increase. The public interest had been served by keeping the gas flowing, and the Commission stated that "it has not been demonstrated whether service was in the greater public interest than possible diminution of United's very significant curtailment during the same period." R. 107, App. 22. After considering all these factors, the Commission held that the equities favored United, and that the price of the payback gas should be the original contract price for the gas at the time it would have been delivered under the contract.

C

Columbia now maintains that the Commission erred in several respects. First, Columbia asserts that the Commission's certificate authorizing the sale of gas to Columbia instead of to United overrides any contract obligations with which the certificate may have interfered. The argument is simple: a certificate supersedes any contract to the contrary.

■ We do not disagree with the principle advanced by Columbia, but we cannot agree that the principle is properly applicable here. Columbia overlooks the important fact that the temporary certificate issued by the Commission specifically referred to the controversy between the parties and expressly provided a remedy if the contract interpretation turned out to favor United, which in fact happened. As we saw previously, the certificate explicitly carved out all rights and interests of the parties in proceedings involving "the rights of United and Columbia to purchase gas produced from the Garden City Field." *See supra* p. 107. The certificate thus authorized Columbia to take delivery of the disputed volumes of gas, but it did not give Columbia the right, in effect, to rise above the legal consequences flowing from the ultimate resolution of the contract dispute.

■ Second, Columbia asserts as error the Commission's use of the word "illegal" in the first page of its opinion, arguing that this characterization permeates the Commission's opinion and renders it irrational.[7] The argument is that Columbia's receipt of the gas occurred under the umbrella of the temporary certificate and was therefore legal.

In a real sense, Columbia is correct: its taking of the gas was in no wise illegal because it was expressly authorized by the Commission certificate. But the Commission's ill-advised use of the term "illegal" does not invalidate its entire remedial exercise. To the contrary, the Commission expressly recognized in its opinion that the legality *vel non* of Columbia's original taking was not at issue here. As the Commission's order itself stated: "Of course, Columbia's argument that it did nothing illegal by taking the gas pursuant to an FPC letter order is correct, in a sense. The legality of Columbia's temporary taking of the gas is not the issue." R. 104, App. 19. The Commission may have used ill-advised language, but its opinion as a whole demonstrates that it did not misconceive the *bona fides* of Columbia's original taking.

■ Columbia further argues, however, that the Commission was analytically incorrect by applying the principle of restitution, when there was, again, no *unlawful* conduct on Columbia's part. This contention also fails. In fashioning a remedy, the Commission is not bound to apply hornbook restitutionary analysis traditionally applied to private contracts. Even assuming *arguendo* the validity of Columbia's understanding of the law of restitution, such a Procrustean requirement would, in our view, unduly circumscribe the Commission's broad discretion to frame appropriate remedies suitable for this particular industry. Moreover, Columbia's view, wedded as it is to its conception of the precise elements of hornbook law, fails to take into account the Commission's bedrock duty in fashioning remedies to consider the public interest, particularly the interests of consumers of the regulated gas. The public interest is, of course, not a factor in traditional applications of the doctrine of restitution, inasmuch as that doctrine evolved at equity in order to achieve justice between the parties before the chancellor. The Commission properly based its determination more broadly on "equitable principles," repeatedly emphasizing its desire to achieve equity and fairness to all concerned, with due regard for the public interest. *E.g.*, R. 105, 113; App. 20, 28.

---

7. Columbia made this point in the following succinct manner in its Request for Rehearing before the Commission as well as in its Reply Brief to this court: "The tone and tenor of this initial sentence permeates the remaining twenty-two pages of the opinion." R. 119; *see also* Reply Brief at 3.

Columbia also maintains that the Commission has departed from applicable precedent in ordering the payback at old prices. Of especial relevance, Columbia argues, is *AEPCO*, where this court upheld the Commission's determination that the pipeline effecting a payback of gas to certain customers would be paid at the then-current rates, not the lower rates of yesteryear when the gas was improperly withheld. This argument was not lost on the Commission, but the agency nonetheless concluded that the case was distinguishable from the situation at hand for several reasons. Because Columbia vigorously advances the proposition that the Commission's perceived distinctions are ill-conceived and that *AEPCO*'s remedy should be the remedy here, we pause to examine that case in some detail.[8]

*AEPCO* involved several orders of the Commission "issued in response to the continuing shortage of natural gas," 631 F.2d at 805, which obtained during the last decade. The background of that case is, briefly, as follows: El Paso Natural Gas Company, like United and Columbia an interstate natural gas transmission company, served customers in California and in five southwestern States east of California. Anticipating impending shortages of natural gas, the Federal Power Commission in 1971 ordered El Paso, as well as other pipelines, to establish curtailment plans. El Paso did so, establishing a priority plan for five separate categories of uses. But the Commission did not stop there. It also ordered El Paso to develop a plan for husbanding gas during the low-demand summer months for use in the high-demand winter months by "temperature sensitive high priority customers." *Id.* at 806. El Paso again did so, but it accomplished this mandated result in a plan that had, the Commission subsequently found, a geographically discriminatory feature—under the plan, El Paso curtailed only low-priority customers east of California to husband the gas for the cold winter months; customers in California

were not so curtailed. The upshot of all this was that El Paso, pursuant to Commission approval, "paid back" the gas to the east-of-California customers in 1978; those customers, however, were required to pay the then-current prices for the gas, not the lower price prevailing earlier at the time of the curtailment. This caused no small consternation among the east-of-California customers who argued, as did United in this proceeding, that the pipeline was entitled to be paid *only* the old price prevailing at the time the gas was discriminatorily diverted from them. The Commission was unpersuaded, and this court affirmed in a rationale that is of considerable relevance to the case before us.

First, the court began by noting, as we already have, the "narrow scope of review over decisions such as the Commission has had to make in this case." *Id.* at 809. The natural gas shortage existed, the court emphasized, and the unavoidable consequence of that exigency was that "some measure of sacrifice [was required] by the companies involved in the distribution and use of natural gas." *Id.* Embracing the apt description of the Third Circuit in this respect, the court observed that not all parties injured in consequence of the crisis could be made whole. *AEPCO*, 631 F.2d at 809 (quoting *Hercules, Inc. v. FPC*, 552 F.2d 74, 89 (3d Cir.1977)). Then, in language which we have already quoted and which obtains just as powerfully here as it did in the case before it, the court held: "it is not the role of the courts to second guess the Commission's judgment because we think we could devise a better solution than that which the agency has adopted so long as the agency's determination has a rational basis." *AEPCO*, 631 F.2d at 809.

In upholding the Commission's order there, the court observed that broader public interests were at stake, not only private interests, and that the Commission had reasonably concluded that El Paso's plan, despite its discriminatory impact on the east-

---

**8.** *AEPCO* is not, of course, the only case in which the Commission has established reme-

dies. *See, e.g.,* cases cited *supra* Part II B.

of-California low priority customers, had " 'served a valuable public service' by assuring adequate winter gas supplies to [east-of-California] high priority customers ...." *Id.* If El Paso were paid only old prices for its restitutionary gas, the Commission concluded and the court agreed, then it would suffer a penalty for providing the valuable protection which its plan, albeit discriminatory, afforded. Under those circumstances, the impact of any such penalty would be inequitable and, importantly, would serve as an industry-wide deterrent against pipelines taking emergency actions to protect service, a result which this court found would be "contrary to the public interest." *Id.* This court went on to note, approvingly, the Commission's consideration of the east-of-California customers' claim that undue hardship would be visited on them if they had to pay today's prices for yesterday's gas. That claim was, the court concluded, properly rejected by the Commission. Certain benefits had accrued to those customers because of El Paso's plan, including a surplus of natural gas during the restitutionary period resulting in savings occasioned by their not having to resort to expensive alternative fuels. Columbia has pointed to no similar benefits for United's customers in this case.

In our view, *AEPCO*'s essential teaching is that, as an expert agency, the Commission is vested with wide discretion to balance competing equities against the backdrop of the public interest, and that the exercise of that discretion will not be overturned unless the Commission's action lacks a rational basis. *AEPCO* clearly does not commit the Commission to a rigid rule of requiring paybacks at current prices nor carve into stone any particular kind of remedy. The *AEPCO* court's careful canvassing of the various factors present in the El Paso curtailment situation underscores the highly fact-specific sifting and weighing of factors that the Commission is, at bottom, to carry out in determining wherein the equities lie. No judicially imposed automatic rules or talismanic tests will do; it is, in the tradition of equity, a matter of an expert Commission's doing justice in the particular case.

We are satisfied that the Commission's remedial exercise here is supported by a rational basis, which is what *AEPCO* at bottom requires. Whatever our own views might be as to the most appropriate remedy in the setting at hand, here the Commission determined, in essence, that United should be made whole and that the economic injury occasioned by the supervening jump in the price of natural gas should be borne by the party, Columbia, whose contract interpretation in the first instance was in error. As the Commission held, "United, with Commission and judicial decisions upholding its right to the gas ... ought to be permitted to pay the price for which it had originally contracted." R. 113, App. 28. That determination, in view of the various factors expressly considered by the Commission, cannot fairly be said to lack a rational basis.[9]

*Affirmed.*

---

**9.** Columbia also asserts that the Commission considered evidence of a nonapproved offer of settlement in its determination, in contravention of Rule 602(e) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.602(e) (1984). Columbia advanced this argument for the first time in its Reply Brief before this court. Rule 602(e) by its own terms prohibits the Commission from considering inadmissible evidence only when a participant objects to its admission. We have been unable to find any indication of an objection being interposed, at any time, before the Commission, including Columbia's petition for reconsideration. In this respect, section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b) (1982), denies judicial review as to any objection not raised before the Commission in an application for rehearing.